UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

M&B GRAPHICS, INC.,

    Plaintiff/Counter-Defendant,                  Case No. 11-10389
                                                                    Hon. Gerald E. Rosen

v.

TOSHIBA BUSINESS SOLUTIONS
(USA), INC.,

    Defendant/Counter-Plaintiff/Third-Party Plaintiff,

v.

ROBERT REIGHARD,

    Third-Party Defendant.
_____/

OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on           March 30, 2012      

PRESENT:  Honorable Gerald E. Rosen
                       Chief Judge, United States District Court

### I. INTRODUCTION

Plaintiff M&B Graphics, Inc. commenced this suit in state court on January 19, 2011, asserting state-law breach-of-contract claims against Defendant Toshiba Business Solutions (USA), Inc. arising from Defendant's lease to Plaintiff of three photocopiers that allegedly are not performing in accordance with the manufacturer's specifications, and from Defendant's alleged failure to properly service these three copiers in accordance

with service agreements entered into by the parties. Defendant removed the case to this Court on January 31, 2011, citing diversity of citizenship between the parties. *See* 28 U.S.C. §§ 1441(a), 1332(a).[1]

Shortly after removal, the Court entered a March 31, 2011 order directing Defendant to continue to perform under the terms of the parties' three service agreements, finding that Plaintiff had demonstrated a likelihood of success as to its claim that Defendant had terminated these agreements without proper cause. By motion filed on July 21, 2011, Defendant now seeks an award of partial summary judgment in its favor on the issue of termination of the service agreements, contending that these agreements are properly subject to termination on one of three grounds: (i) in light of Plaintiff's purported misuse and abuse of the photocopiers covered by these agreements; (ii) for failure of Plaintiff to timely make the payments called for under these agreements; and (iii) through the exercise of Defendant's right to terminate the agreements on the anniversary date each year upon which the agreements otherwise would automatically renew for another year. Through its motion, Defendant seeks a ruling as a matter of law that it has properly terminated the service agreements, and it asks that the Court dissolve its March 31, 2011 order directing Defendant to continue to perform under these

---

[1] While it might appear open to question whether the amount in controversy here exceeds the statutory threshold of $75,000, *see* 28 U.S.C. § 1332(a), Defendant states in its notice of removal that Plaintiff seeks (among other relief) rescission of the three 63-month copier leases entered into by the parties. According to Defendant, the remaining payments under these leases totaled approximately $115,650 at the time of removal.

agreements.

Defendant's motion has been fully briefed by the parties.[2] Having reviewed the parties' briefs and accompanying exhibits, the Court finds that the relevant allegations, facts, and legal issues are adequately presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Defendant's motion "on the briefs." *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. For the reasons stated below, the Court finds that this motion should be granted.

## II. FACTUAL AND PROCEDURAL BACKGROUND

For present purposes, the pertinent facts of this case may be briefly summarized. On August 10, 2009, Plaintiff M&B Graphics, Inc., a Michigan-based print shop, leased three high-performance Toshiba photocopiers from Defendant Toshiba Business Solutions (USA), Inc. Two of these copiers (one black-and-white and one color) were placed in Plaintiff's print shop in Richmond, Michigan, and the other (a color copier) was to be used at Plaintiff's shop in Lake Orion, Michigan. This lease was for a 63-month term, at a cost of $2,520 per month for the three copiers. (*See* Defendant's Motion, Ex. 1,

---

[2]Apart from this motion, Plaintiff and its president, Third-Party Defendant Robert Reighard, have filed a motion seeking awards of summary judgment in their favor as to Plaintiff's breach-of-contract claims, Defendant's counterclaims of breach of contract and quantum meruit, and Defendant's third-party claim of defamation brought against Mr. Reighard. This latter motion will be addressed separately in a forthcoming opinion.

3

8/10/2009 Lease.)³

At the same time, the parties entered into three service agreements, one for each of the three photocopiers covered under the lease. (*See* Defendant's Motion, Ex. 2, 8/10/2009 Service Agreements.) These agreements called for Defendant to perform routine maintenance and repair of the three copiers, in exchange for payment of flat monthly and per-copy charges.⁴ Under the terms and conditions accompanying these agreements, Defendant was not obligated to make any repairs "made necessary by accident, misuse, [or] abuse . . . , or by the use of supplies or spare parts not meeting [Defendant's] specifications." (*Id.,* Terms and Conditions.) In addition, Defendant was entitled to immediately terminate the service agreements in the event of Plaintiff's failure to comply with their terms and conditions, including a "failure to make any payment herein provided within net 30 day terms." (*Id.*) The agreements further provided that they would "automatically renew for successive one (1) year terms . . . on the anniversary of the start date," except that they could be terminated by either party through "written

---

³Later in August of 2009, the parties entered into two so-called "FMV Lease Agreements," one covering the two copiers located at Plaintiff's Richmond shop, and the other covering the copier that was placed at Plaintiff's Lake Orion location. (*See* Defendant's Motion, Ex. 5, FMV Lease Agreements.) These agreements retained the 63-month term of the original lease, but they called for combined monthly payments of $2,570, slightly more than the $2,520 monthly payment called for under the original lease. According to Defendant, the parties entered into these FMV Lease Agreements in order to facilitate Plaintiff's assignment of its lease obligations to third-party equipment finance companies.

⁴The parties refer to the per-copy charges as "click" rates, with each photocopier having a meter that records each copy as a "click."

notice within 30 days prior to the anniversary date of the agreement." (*Id.*)[5]

Since the parties entered into the lease and service agreements in August of 2009, Plaintiff has experienced a number of problems while using the copiers in the manner it desires. According to Defendant, the bulk of these problems are attributable to Plaintiff's use of a thick, rigid, and coated glossy paper that Plaintiff purchases in large sheets and cuts to copier size. This led to a number of service calls throughout the latter portion of 2009 and into 2010, with Defendant's service technicians opining that Plaintiff would continue to experience difficulties if it continued to use its own custom-cut paper.

On December 30, 2010, Defendant sent Plaintiff a letter stating that it was terminating the parties' service agreements immediately "for failure to comply with the stated terms and conditions" set forth in those agreements. (Plaintiff's Amended Complaint, Ex. C.) When the parties were unable to negotiate a satisfactory resolution of their dispute, Plaintiff commenced this suit in January of 2011, asserting breach-of-contract claims arising from (i) the alleged failure of Defendant's copiers to perform up to the manufacturer's specifications, (ii) Defendant's alleged failure to live up to its obligations under the service agreements, and (iii) Defendant's allegedly unjustified attempt to impose an unreasonable increase in the per-copy fee stated in the service

---

[5]Defendant was authorized under the service agreements to adjust the per-click charges at the end of each 12- month period. (*See id.*) The parties' lease, however, included language calling for the per-copy cost to be "locked for term of agreement." (Defendant's Motion, Ex. 1, 8/10/2009 Lease.) For purposes of this litigation, Defendant has conceded that the language of the lease governs over the apparently conflicting terms of the service agreements, so that the per-copy charges set forth in the service agreements could not be increased during the 63-month term of the lease.

5

agreements. In addition, Plaintiff sought a preliminary injunction that would enjoin Defendant from (i) refusing to service the three leased copiers, (ii) terminating the service agreements, (iii) preventing Plaintiff from using its preferred glossy paper, and (iv) imposing any per-copy price increase.

Following a March 21, 2011 hearing, the Court entered a March 31, 2011 order in which it directed Defendant to continue to perform under the three service agreements, with each party's performance to be governed by the initial terms of these agreements (including their click rates). Through the present motion, Defendant argues that it is now entitled to terminate the service agreements on a number of grounds, and it seeks a ruling that would (i) recognize this right of termination as a matter of law, and (ii) dissolve the March 31, 2011 order that mandates Defendant's continued performance under the service agreements.

### III.  ANALYSIS

**A.     The Standards Governing Defendant's Motion**

Through the present motion, Defendant seeks an award of summary judgment in its favor on the issue of its entitlement to terminate the August 10, 2009 service agreements entered into by the parties. Under the pertinent Federal Rule, "[a] party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought," and "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As

the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on mere allegations or denials, but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

**B.     Defendant Has Established as a Matter of Law Its Entitlement to Terminate the Service Agreements.**

As set forth above, the August 10, 2009 service agreements are subject to

termination on a number of grounds. In support of the present motion, Defendant contends that three of these grounds for termination have been established as a matter of law: (i) termination for failure to make the required payments, (ii) termination at will on the anniversary date of the service agreements, and (iii) termination in response to Plaintiff's alleged misuse or abuse of the photocopiers. The Court readily concludes that the first two grounds for termination exist, and thus it need not address the third.

### 1. Termination for Failure to Make Timely Payments

Under the terms and conditions accompanying the parties' August 10, 2009 service agreements, Defendant is entitled to immediately terminate the agreements if Plaintiff "fails to perform or keep any term or condition hereof (including failure to make any payment herein provided within net 30 day terms)." (Defendant's Motion, Ex. 2, 8/10/2009 Service Agreements, Terms and Conditions.) Defendant contends that this ground for termination has been conclusively established, citing the testimony of Plaintiff's president, Robert Reighard, that as of the date of his deposition on June 16, 2011, Plaintiff owed Defendant "probably about 3 or $4,000." (Defendant's Motion, Ex. 7, R. Reighard Dep. at 121.) Defendant further points to Mr. Reighard's assurance at his deposition that he would "cut a check next week for positively sure" to cover the amount owed by Plaintiff. (*Id.* at 122.) Because no such payment was forthcoming in the month between Mr. Reighard's deposition and the filing of the present motion, Defendant argues that this delinquency has triggered its right to terminate the service agreements. The Court agrees.

8

In its response in opposition to Defendant's motion, Plaintiff studiously ignores the sworn testimony of its president, Mr. Reighard, that several thousand dollars were owed to Defendant as of the date of Mr. Reighard's deposition.  Likewise, Plaintiff has no answer to — indeed, it does not even acknowledge — Defendant's contention that no payments were forthcoming on the amounts that Mr. Reighard admitted were owed.  Instead, Plaintiff baldly asserts, without citation to the record, that it is "paying what is indisputably owed."  (Plaintiff's Response Br. at 15.)  This does not suffice to meet Plaintiff's burden to support its claim of a factual dispute by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1).[6]

Alternatively, Plaintiff appears to suggest that it was relieved of its obligation to pay Defendant by virtue of purported errors in some of the invoices issued by Defendant.  Plaintiff notes, for example, that the invoices accompanying Defendant's December 30, 2010 letter announcing the termination of the service agreements reflected increased per-copy costs, in apparent contravention of the language in the parties' lease providing that these per-copy rates were "locked" for the 63-month term of the lease.  Plaintiff also contends that the invoices produced by Defendant in the wake of the March 21, 2011

---

[6]Though Plaintiff has not taken the trouble to cite to the record, its claim of full payment arguably could be supported by Mr. Reighard's assertions in an August 4, 2011 affidavit that "I have paid all current invoices except for the months [Defendant] was not prov[id]ing service," and that "most likely I have . . . over[]paid [Defendant]."  (Plaintiff's Response, Ex. G, R. Reighard Aff. at ¶ 14.)  This affidavit, however, was executed over a month after Mr. Reighard was deposed, and it is well established that a nonmoving party "cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony."  *Penny v. United Parcel Service,* 128 F.3d 408, 415 (6th Cir. 1997).

preliminary injunction hearing included charges for the period in early 2011 during which Defendant had ceased to service the copiers. Plaintiff further asserts that these post-hearing invoices failed to reflect the payments it made to other service providers to remediate Defendant's alleged breach of its obligations under the service agreements, and it suggests that these payments should have been credited against the amounts owed to Defendant.

These quibbles over the accuracy of Defendant's past invoices, however, are wholly immaterial to the issue presently before the Court. Simply stated, Plaintiff has admitted, through the unrefuted deposition testimony of its president, that it owed several thousand dollars to Defendant as of June 16, 2011, and nothing in the record contradicts Defendant's assertion that this amount remained unpaid for at least 30 days thereafter. Even assuming that certain of Defendant's invoices misstated the amounts owed by Plaintiff under the parties' service agreements, Plaintiff has cited no authority for the sweeping and remarkable proposition that these errors altogether and forevermore relieved Plaintiff of its obligation of timely payment under the service agreements.[7] It is not the duty of this Court to identify legal principles or case law that would forge a link between errors in Defendant's invoices and the liberation of Plaintiff from its obligation to timely remit payments to Defendant at the rates set forth in the service agreements.

---

[7]Indeed, given Defendant's acknowledgment of errors in some of its invoices, Plaintiff's argument, if accepted and taken to its logical conclusion, would preclude Defendant from taking any action in response to Plaintiff's failures to make payments for the duration of the parties' contractual relationship.

Because Plaintiff has failed to identify any basis in the law for relieving it of this obligation, and because the record establishes a breach of this obligation, the Court finds as a matter of law that Defendant was entitled to invoke the provision in the service agreements that authorized the termination of these agreements upon Plaintiff's failure to timely pay the amounts owed under the agreements.

### 2. Termination at Will on the Annual Renewal Date

Defendant next argues that it was entitled to terminate the service agreements at will on their anniversary dates. Under their accompanying terms and conditions, the service agreements "automatically renew[ed] for successive one (1) year terms, with such renewals taking place on the anniversary of the start date." (Defendant's Motion, Ex. 2, 8/10/2009 Service Agreements, Terms and Conditions.) This automatic renewal, however, was subject to a provision that allowed either party to "terminate this agreement by written notice within 30 days prior to the anniversary date." (*Id.*) It readily follows, in Defendant's view, that it had a right each year to terminate the service agreements by giving written notice within 30 days of the anniversary date of August 10, and Defendant states without contradiction that it sent the requisite notice to Plaintiff on July 11, 2011, stating its intention to terminate the agreements effective August 10, 2011. (*See* Defendant's Motion, Ex. 10, 7/11/2011 Notice.) Consequently, even if the service agreements were not previously terminated on other grounds, Defendant contends that they should be deemed terminated through Defendant's exercise of this annual right to terminate at will. The Court again agrees.

Plaintiff advances two arguments against this result, but neither is persuasive. First, Plaintiff asserts that it was the intention of both parties to treat the photocopier lease and the three service agreements as a single contract. Given the 63-month duration of the lease, and given the absence of any provision in the lease that would permit termination at will during its lifetime, Plaintiff surmises that the lease and service agreements, read collectively, should override any language in the service agreements that confers a right of termination before the end of the 63-month term of the lease.

This argument, however, rests impermissibly upon evidence that is barred by Michigan's parol evidence rule. Directly above the signature of Plaintiff's president, Mr. Reighard, each of the three service agreements includes the following language:

> I have read and agree to the terms and conditions under this maintenance agreement. These constitute the entire understanding between [Defendant] and myself and no other written or oral representation by any part shall be binding upon [Defendant].

(Defendant's Motion, Ex. 2, Service Agreements at 1.)  Under well established Michigan law, this integration clause precludes the introduction of extrinsic evidence as to any prior or contemporaneous agreements or understandings that would alter or contradict the clear terms of the parties' contract. *See Hamade v. Sunoco, Inc.,* 271 Mich. App. 145, 721 N.W.2d 233, 247-50 (2006); *UAW-GM Human Resource Ctr. v. KSL Recreation Corp.,* 228 Mich. App. 486, 579 N.W.2d 411, 415-19 (1998); *Newburgh/Six Mile Limited Partnership II v. Adlabs Films USA, Inc.,* 724 F. Supp.2d 740, 754-56 (E.D. Mich.

2010).[8]

In this case, Plaintiff's "single contract" theory rests not upon any language in the lease or service agreements, but instead upon extrinsic evidence of the parties' purported "intent" as they entered into these agreements. Plaintiff cites, for instance, the assertion of Mr. Reighard in his affidavit that it was his "intention that . . . the Lease and the Service Agreements be as one contract." (Plaintiff's Response, Ex. G, R. Reighard Aff. at ¶ 2.) Plaintiff also points to Mr. Reighard's testimony at his deposition as to his interpretation of language in the lease that established a fixed cost-per-copy for the lifetime of the lease:

> Q: So it's your testimony that the phrase on [the lease] stating, "Cost per copy to be locked for term of the agreement," obligates [Defendant] to service the [copiers] for 63 months?
>
> A: That's correct.
>
> Q: Okay. It doesn't say that, though, does it? It doesn't say anything about

---

[8]Although there is a limited exception to this parol evidence rule in the case of fraud relating to the integration clause itself or fraud that would invalidate the contract in its entirety, *see UAW-GM,* 579 N.W.2d at 419; *Newburgh/Six Mile Limited Partnership,* 724 F. Supp.2d at 755-56, Plaintiff has not claimed or produced evidence of any such fraud here in connection with its execution of the service agreements. Even if Plaintiff were to claim (though it has not) that it received some sort of assurance from Defendant that the service agreements could not be terminated during the 63-month term of the lease, Plaintiff could not establish the requisite reasonable reliance on any such assurance that deviated from the express terms of the service agreements that were placed before Plaintiff's representative, Mr. Reighard, and signed contemporaneously with this alleged assurance. *See Hamade,* 721 N.W.2d at 249-50; *Newburgh/Six Mile Limited Partnership,* 724 F. Supp.2d at 755-56. This absence of any viable claim of fraud that would overcome the legal effect of an integration clause serves to distinguish this case from the one cited by Plaintiff, *Custom Data Solutions, Inc. v. Preferred Capital, Inc.,* 274 Mich. App. 239, 733 N.W.2d 102, 105-06 (2006), in which the court found that the parties' contract, including its merger clause, was invalidated by fraud in the inducement.

>>any obligation for [Defendant] to service the copiers for 63 months.
>
>A:    Well, you know, I guess it's a little too short and sweet, but that was the intention. I mean, that's what I asked for. And if that was something — if this wasn't good enough, well, I guess, shame on me, but this is what it was supposed to be.

(Defendant's Motion, Ex. 7, R. Reighard Dep. at 99.)

Michigan's parol evidence rule flatly precludes the consideration of these statements by Mr. Reighard as to what he or both parties purportedly intended as they entered into the lease and service agreements. As a guide to determining the terms of a contractual relationship, the Michigan courts have instructed that "the primary goal of contract interpretation is to honor the parties' intent," and that "[w]hen the contract is unambiguous, the parties' intent is gleaned from the actual language used." *Prentice Family Foundation, Inc. v. Barbara Ann Karmanos Cancer Institute*, 266 Mich. App. 39, 698 N.W.2d 900, 914 (2005). In this case, Plaintiff does not claim that the provision in the service agreements conferring an annual right of termination is ambiguous, nor has it suggested how this provision was somehow rendered more vague or uncertain by virtue of the parties' execution the same day of a lease with a fixed 63-month term that lacked such a right of termination at will. Consequently, because this provision is clear and unambiguous, and because it is contained within a contract that includes an integration clause evidencing Plaintiff's agreement that the contract "constitute[d] the entire understanding" between the parties, Plaintiff cannot appeal to extrinsic evidence to alter

or override the plain meaning of this provision.[9]

Next, Plaintiff suggests that once Defendant sent its December 30, 2010 letter purporting to exercise its right to terminate the service agreements for cause, this operated as some sort of "election of remedies" that precluded Defendant from invoking the separate provision authorizing termination at will on the anniversary date of the agreements. Once again, however, Plaintiff has failed to identify any legal support for the novel proposition that a party's exercise of one contractual right of termination operates to preclude that party from later exercising a second, independently triggered right of termination. To be sure, the initial termination, if proper and effective, ordinarily would

---

[9]Notably, even if the Court were to consider the extrinsic evidence produced by Plaintiff, it is doubtful whether this evidence would give rise to an issue of fact as to Defendant's annual right to terminate the service agreements. Plaintiff's evidence consists almost exclusively of statements of *Mr. Reighard's* intent as he signed the agreements on Plaintiff's behalf. Yet, as to the question whether Defendant shared this intent, Plaintiff points only to the testimony of Defendant's vice president and general manager, Anthony Pusino, that if a customer preferred "one bill," Defendant would agree to "roll [the service agreement] up into the lease," a practice he estimated as occurring with "probably 90 percent" of Defendant's customers. (Plaintiff's Response, Ex. E, Pusino Dep. at 8-9.) Given this testimony that Defendant would honor customer requests for a single contract encompassing both a copier lease and a service agreement, Plaintiff surmises that Defendant would have shared Mr. Reighard's intent that this typical "single contract" practice be followed here.

The fatal flaw in this logic, of course, is that Defendant actually presented Mr. Reighard with separate agreements covering the lease and servicing of the photocopiers, and that Mr. Reighard proceeded to sign these separate agreements. These separate contracts, by their express terms, were for different durations and included distinct termination provisions — or, in the case of the lease, no provision for termination prior to the end of the 63-month term. Under Michigan law, Plaintiff is bound by the clear and unambiguous terms of these separate contracts. In any event, since the principal objective of the "rolling up" practice discussed by Mr. Pusino is to generate a single bill for customer convenience, nothing in this practice would preclude the possibility of a single contract with separate and distinct terms governing the duration and termination of the equipment lease and the duration and termination of Defendant's service obligations. Contrary to Plaintiff's tacit assumption, the two are not mutually exclusive.

obviate the need to terminate the agreement a second time. Here, however, Plaintiff has asserted that Defendant's initial termination of the service agreements was *not* proper, and the Court has tentatively accepted this contention, issuing a March 31, 2011 order in which Defendant was directed to continue to perform under the agreements. This order, however, did not serve to rewrite the remaining terms of the parties' agreements; to the contrary, it provided that the parties' performance under these agreements was to be "governed by the initial terms of the agreements." (3/31/2011 Order at 1-2.) Accordingly, Defendant retained the right to invoke the provision in the service agreements that authorized termination at will on the anniversary date[10] — subject, of course, to an order of this Court relieving Defendant of the obligation of continued performance as imposed in the Court's earlier order. The Court finds as a matter of law that Defendant has properly invoked this provision in the parties' agreement, and that relief from the March 31, 2011 order is therefore warranted.[11]

---

[10]As perhaps the most preposterous argument advanced in its response to Defendant's motion, Plaintiff suggests that this right of termination at will arose only on the *first* anniversary date of the service agreements, August 10, 2010, and not on subsequent anniversary dates. This argument ignores the automatic renewal provision of the service agreements, which states that the agreements will "automatically renew for successive one (1) year terms, with such renewals taking place on the anniversary of the start date, *unless 30 days prior notice is given, as set forth below.*" (Defendant's Motion, Ex. 2, 8/10/2009 Service Agreements, Terms and Conditions (emphasis added).) Immediately following this provision, the service agreements set forth the right of either party to "terminate this agreement by written notice within 30 days prior to the anniversary date of the agreement." (*Id.*) It is utterly clear, then, that the right of termination at will arises on *each* anniversary date of the agreements, with the agreements subject to automatic one-year renewal in the event that neither party exercises this right of termination.

[11]Given the Court's conclusion that the service agreements are subject to termination on two grounds — *i.e.,* for lack of timely payment, and as a result of Defendant's exercise of its

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's July 21, 2011 motion for partial summary judgment (docket #23) is GRANTED. In light of the Court's ruling that Defendant has properly terminated the service agreements entered into by the parties, IT IS FURTHER ORDERED that the Court's March 31, 2011 order mandating Defendant's continued performance under these agreements is DISSOLVED. Finally, in light of the dissolution of the March 31, 2011 order, IT IS FURTHER ORDERED that Defendant's April 14, 2011 motion for reconsideration (docket #18) is DENIED AS MOOT.

                                  s/Gerald E. Rosen
                                  Chief Judge, United States District Court

Dated: March 30, 2012

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 30, 2012, by electronic and/or ordinary mail.

                                  s/Ruth A. Gunther
                                  Case Manager

---

right of termination on the anniversary date — the Court declines to address Defendant's contention that the agreements also were subject to termination because of Plaintiff's alleged misuse or abuse of the photocopiers. This same issue (among others) is presented in Plaintiff's pending motion for summary judgment, and the Court has elected to address this issue (as well as the underlying motion) in a separate opinion.